THE MANUEL CALVO. THE TRANSFER NO. 19.   THE CAR FLOATS
NOS. 40 AND 42.

(District Court, S. D. New York.  May 7, 1912.)

COLLISION (§ 95*)—STEAM VESSELS—VIOLATION OF RULES.

> A collision to the westward of the main ship channel in New York Bay
> between the steamship Calvo, passing out to sea, and a car float on the
> side of Transfer Tug No. 19, which had just passed out from the channel
> extending from the Pennsylvania Terminal at Greenville, N. J., *held*
> due solely to the fault of the tug in not assenting to the Calvo's signal
> of one blast, and either keeping her course and speed, if she was then
> coming into the ship channel and on a crossing course, or if she had
> straightened out, and on a meeting course, in not keeping to starboard,
> as required by the rules, instead of which she answered with two blasts
> and starboarded, keeping up the west side of the channel, in violation
> of the narrow channel rule.

> [Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec.
> Dig. § 95.*

> Signals of meeting vessels in collision, see note to The New York, 30
> C. C. A. 630.]

In Admiralty.  Suit for collision by the Compania Transatlantica,
owner of the Spanish steamship Calvo, against Transfer No. 19 and
Car Floats Nos. 40 and 42, with cross-libel by the New York, New
Haven & Hartford Railroad Company, owner of the Transfer and
Car Floats.  Decree. for libelant.

Hunt, Hill & Betts, of New York City, for libelant.
Jas. T. Kilbreth, of New York City, for respondent.

WARD, Circuit Judge.  .There are some very material facts not
in dispute.  February 14, 1911, at about 4:30 p. m., the Transfer,
on her way from the Pennsylvania Terminal at Greenville, N. J., to
Oak Point, in the Bronx, with a car float on each side, came into
collision with the steamer Calvo, bound from Pier 14, East River, on
a voyage to sea.  Flurries of snow were frequently occurring, but it
was at all times possible to see vessels at a distance of a mile, and
no fog signals were being blown.  The collision happened west of the
western side of the main ship channel, near the red buoy at the entrance
of the Greenville channel, which runs from the Pennsylvania Terminal
southeast to the ship channel.  The starboard corner of No. 19's
starboard float came into contact with the Calvo's port bow about
six feet abaft the stem, doing considerable damage; neither vessel
at the time having much headway.  At the time of collision the Calvo
was heading in toward the Jersey shore to the west, and the Trans-
fer was heading about N. by W., so that the blow was nearly at a
right angle.

The regular course up and down the main ship channel at this point
is S. W. by S. and N. E. by N., and the Court of Appeals of this
circuit has held in La Bretagne, 179 Fed. 286, 102 C. C. A. 651, that
it is a narrow channel, within article 25 of the Inland Regulations.
(U. S. Comp. St. 1901, p. 2870).  It is therefore apparent that, if the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

vessels were proceeding on the regular courses, the Calvo must have departed three or four points from her course and the Transfer four or five points from hers. It is also clear that, if both vessels had either ported or starboarded (which there was nothing to prevent them from doing), they would have passed each other in safety, and that the collision was the result of their steering in the same direction.

The pleadings of the Calvo allege that when coming down on the western side of the channel she discovered the Transfer on her starboard bow coming out of the Greenville channel, heading over to the eastward to Bay Ridge on a crossing course. The steamer thereupon blew one whistle and ported. The Transfer shortly after answered with two blasts and starboarded. The steamer blew another signal of one whistle and hard aported. The Transfer answered with a signal of two whistles, and continued her course to port until the collision happened.

The Transfer's pleadings say that as she came out of the Greenville channel she straightened up on the usual course N. E. by N. on the western side of the channel and blew the Calvo, which was coming down on the easterly side, a signal of two whistles, which was not answered. No. 19 blew a second signal of two whistles, which was not answered, and then she went full speed astern on her engines and blew the alarm. The Calvo ported and came across and into collision with the Transfer's starboard float, blowing a signal of one whistle just before the collision. Witnesses on each side testify that proper whistles were blown to indicate the intention of each vessel. If they were, neither vessel heard the signals of the other in time to conform to them.

The steamer was certainly the better provided with persons in charge of her navigation. The captain, pilot, first, second, and third officers, a quartermaster at the wheel, and another pilot on his way to the station boat, were on the bridge, and the boatswain on lookout at the bow. On the Transfer a deckhand was standing on lookout on the second or third outside car of the starboard float; the master and another deckhand (who was not called as a witness) being in the pilothouse.

The pilot in charge of the steamer and the passenger pilot both testify that the Transfer was first seen when coming out of the Greenville channel on the steamer's starboard side on a crossing course, and that the steamer thereupon blew one whistle and ported. This is also the account pleaded, but the master and officers of the steamer and the lookout all testify that the Transfer when first seen was on a meeting course dead ahead, and I so understand the expression in the translation of the steamer's log that the Transfer was sighted "on our bow." Moreover, counsel for the Transfer, when stating its defense, as is usual when depositions are being taken by the libelant before answer filed, said that when the vessels discovered each other they were on meeting courses, but starboard to starboard; the Transfer being on the western and the Calvo on the eastern side of the channel. However, the Transfer's pleadings when filed stated, and

her witnesses at the trial testified, that they saw the steamer as they were coming out of the Greenville channel on a crossing course.

If this latter account be adopted, the Transfer was clearly at fault as the privileged vessel for not holding her course, as well as for insisting upon going up on the wrong side of the channel.

The great weight of testimony is that the vessels began to navigate with reference to each other when they were less than a mile apart on meeting courses; the Calvo S. W. by S., and the Transfer N. E. by N.

The Transfer's pleadings state, and her master testified, that it was in this situation that he blew his first signal of two whistles, and the witnesses from the steamer's company also testified that it was in this situation that she first blew her signal of one whistle and ported.

If the Calvo were then on the eastern side of the channel, there was no necessity for any exchange of signals, and I do not believe that in such a situation whistles would have been blown, still less that the Calvo would have deliberately run across into a wholly unnecessary collision on the anchorage grounds. The master of the Transfer, who showed a complete unfamiliarity with the steering and sailing rules, instead of holding his course out of Greenville channel, admits that he starboarded, and the lookout testified that when he reported the steamer the master said:

"I ain't going to cross her anyway. I am going to keep on this shore."

I think that, when about straightened up ahead of the Calvo, he starboarded again with the intention of doing this. At the same time the Calvo, for the purpose of passing port to port in accordance with the law (Inland Regulations, art. 18, rule 1), blew one whistle and ported. The Transfer did not answer, but bore to port, whereupon the steamer blew another signal of one whistle, hard aported, stopped her starboard engine, and went ahead on her port engine full speed, with the intention of turning as sharply as possible to starboard. Then, seeing the collision to be inevitable, she went full speed astern on both engines. On the other hand, the Transfer, when she heard the signal of one whistle from the Calvo, replied with two, then blew an alarm, and went full speed astern. I think the Transfer solely at fault, and that by her improper navigation she put the Calvo into an embarrassing and critical situation. Even if it should now appear wiser for the Calvo to have gone full speed astern at once, instead of trying to escape by porting, it should, I think, be considered an error, and not a fault, on her part.

There will be a decree in favor of the libelant, with costs, and dismissing the cross-libel, with costs.